[Cite as *Fatokun v. Fatokun*, 2025-Ohio-1131.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| FAITH FATOKUN | C.A. No.    24CA012094 |
|---|---|
| Appellant | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| PETER FATOKUN | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellee | CASE No.    21-DU-089251 |

DECISION AND JOURNAL ENTRY

Dated: March 31, 2025

---

SUTTON, Presiding Judge.

**{¶1}** Plaintiff-Appellant Faith Fatokun appeals the judgment of the Lorain County Court of Common Pleas, Domestic Relations Division. For the reasons that follow, this Court affirms.

## **Relevant Background**

**{¶2}** Defendant-Appellee Peter Fatokun and Mrs. Fatokun were married on April 8, 2011, and two children were born as issue of their marriage. Mrs. Fatokun filed a complaint for divorce on May 5, 2021, and Mr. Fatokun filed an answer and counterclaim. A guardian ad litem was appointed to represent the interests of the minor children. Prior to their divorce being finalized, the parties stipulated to several things including a de facto termination date of their marriage on May 21, 2021, and certain issues relating to the division of marital property, including the sale of the parties' marital residence.

**{¶3}** On February 16, 2024, the trial court issued a judgment entry of divorce. Relevant to this appeal, the trial court determined Mr. Fatokun the "residential and custodial parent over

both minor children." Mrs. Fatokun received parenting time with the minor children per two options, one option if both parents reside in Ohio, and another option if Mrs. Fatokun resides out of state. Further, the trial court determined shared parenting was not, at this time, in the best interest of the parties' minor children. The trial court ordered Mrs. Fatokun to compensate Mr. Fatokun $6,145.00 based upon her 2021 tax refund of $8,690.00, and his 2021 tax payment of $3,600.00, and also ordered Mrs. Fatokun to reimburse Mr. Fatokun $4,480.00, which constitutes one-half of the amount Mrs. Fatokun withdrew from the parties' joint checking account on April 19, 2021, and May 3, 2021.

{¶4} Mrs. Fatokun appealed, raising four assignments of error for our review. We group certain assignments of error to facilitate our discussion.

## II.

### ASSIGNMENT OF ERROR I

**THE TRIAL COURT ERRED WHEN IT FOUND THAT [MR. FATOKUN] SHALL BE THE CUSTODIAL PARENT OF THE MINOR CHILDREN AND ORDERED THAT THE MINOR CHILDREN SHOULD BE RETURNED TO OHIO FORTHWITH.**

{¶5} In her first assignment of error, Mrs. Fatokun argues the trial court erred in naming Mr. Fatokun the custodial parent of the minor children and in ordering her to return the minor children to Ohio.

{¶6} "A trial court possesses broad discretion with respect to its determination of the allocation of parental rights and responsibilities, and its decision will not be overturned absent an abuse of discretion." *Kokoski v. Kokoski*, 2013-Ohio-3567, ¶ 26 (9th Dist.). An abuse of discretion is present when a trial court's decision "'is contrary to law, unreasonable, not supported by evidence, or grossly unsound.'" *Menke v. Menke*, 2015-Ohio-2507, ¶ 8 (9th Dist.), quoting *Tretola v. Tretola*, 2015-Ohio-1999, ¶ 25 (3d Dist.).

**{¶7}** "If only one parent requests shared parenting and files a proposed plan, the court may approve the plan if it is in the best interest of the children." *Stahl v. Stahl*, 2017-Ohio-4170, ¶ 5 (9th Dist.), citing R.C. 3109.04(D)(1)(a)(iii). "In determining the best interest of the children . . . , a court must consider the factors listed in R.C. 3109.04(F)(1)." *In re A.A.*, 2019-Ohio-902, ¶ 15 (9th Dist.). Those factors include: (1) the wishes of the parents for the care of the children; (2) the wishes and the concerns of the children as expressed to the court; (3) the children's interaction and interrelationship with the parents and any others who might significantly affect their best interest; (4) the children's adjustment to their home, school, and community; (5) the mental and physical health of all involved; (6) the parent more likely to honor visitation and companionship; (7) whether a parent has failed to make child support payments; (8) whether a parent has a criminal conviction; (9) whether either parent has continuously and willfully denied the other parenting time in accordance with a court order; and (10) whether either parent has or plans to establish a residence outside the state. R.C. 3109.04(F)(1)(a)-(j).

**{¶8}** A request for shared parenting also triggers additional best-interest factors that a court must consider under R.C. 3109.04(F)(2) and R.C. 3119.23. *Kirchhofer v. Kirchhofer*, 2010-Ohio-3797, ¶ 27 (9th Dist.). Those factors include the ability of each parent to cooperate and make joint decisions, the ability of each parent to encourage a positive relationship between the child and the other parent, any history of abuse by either parent, the geographic proximity of the parents to each other, and the recommendations of the guardian ad litem. R.C. 3109.04(F)(2)(a)-(e). "'While helpful to a reviewing court, there is no requirement that a trial court expressly and separately address each best-interest factor.'" *Donley v. Donley*, 2010-Ohio-3544, ¶ 12 (9th Dist.), quoting *Wise v. Wise*, 2010-Ohio-1116, ¶ 5 (2d Dist.).

{¶9}    Upon review of the record, we cannot conclude the trial court abused its discretion in awarding Mr. Fatokun sole custody of the minor children, and awarding Mrs. Fatokun parenting time, per option 1 or option 2, with the minor children.  The record reflects the trial court considered the best interests of the children and fashioned its determinations with those interests in mind.  Specifically, the trial court indicated "[t]hroughout the entire divorce process, [Mrs. Fatokun] has obstructed [Mr. Fatokun's] ability to be a father to his children."  As part of its investigation, the trial court met with the parties' minor children in camera.  The trial court indicated it did not find any credible testimony or evidence that Mr. Fatokun had been abusive to the minor children.  Further, the trial court stated: "[Mrs. Fatokun] appears to do and say whatever it takes, including disobeying court orders or making false allegations against [Mr. Fatokun], to obstruct [Mr. Fatokun] from being a father to his children."  The trial court found Mr. Fatokun's testimony as to Mr. Fatokun's intention to be active in his children's lives credible, and also found credible the testimony of other witnesses that Mr. Fatokun has been "an active appropriate good father."  After a year of no contact with the minor children due to Mrs. Fatokun's filing of domestic violence charges against Mr. Fatokun, which were subsequently dismissed by the State, Mrs. Fatokun took the children to Texas for a "spring break" trip at the beginning of Mr. Fatokun's court ordered supervised visitation.[1]  Specifically, in its order, the trial court explained:

> The marital home was sold in March of 2023, therefore, the parties moved out of the home.  Father has made the court aware of his address, however, Mother has been elusive as to where she is living.  According to testimony, Mother took the children to Texas after the sale of the home but allegedly only for 'spring break'.

> Mother taking the children on a 'spring break' trip just so happened to coincide with the beginning of court ordered supervision between the minor children and Father after more than a year of no contact.  Mother, without the court's permission and despite an active court order for Father's visitation to begin, took the children

---

[1] We note Mrs. Fatokun acknowledges moving to Texas with the minor children after the 2023 school-year ended.

to Texas, thus causing more of a fray in the parental relationship with Father and children.

No extra parenting time was given to Father for any of the three missed visitation dates for the 'spring break' as of the trial date. Further, at trial Father testified to at least ten missed visitation dates, and again no make-up parenting time was given to him.

Further, after returning from the spring break trip to Texas, Mrs. Fatokun moved the children into an extended stay hotel and put a down payment on two rental properties in Texas, "despite the established community the children are a part of in Ohio and despite Father remaining in Ohio." The trial court also discredited Mrs. Fatokun's worry that Mr. Fatokun would take "the children out of the country and away from her," when Mrs. Fatokun has actually taken the children out of their home county and their home state of Ohio away from Mr. Fatokun.

{¶10} The trial court also expressly considered the minor children's bond with their parents, the guardian ad litem's report and testimony, the parties' wishes for the care of the minor children, including Mr. Fatokun's proposed shared parenting plan if Mrs. Fatokun remained in Ohio, the mental health of the minor children and which parent would facilitate court ordered counseling, the parent who would more likely honor visitation and companionship, the continuous and willful denial of parenting time in accordance with a court order, and Mrs. Fatokun's intention to move to Texas with the minor children.

{¶11} Specifically, as to counseling for the minor children, the trial court indicated Mrs. Fatokun did not follow through with the guardian ad litem's recommendation that the parties' minor son and Mr. Fatokun attend counseling together because "it was not an order of the court." As to individual counseling for the parties' minor son, the trial court indicated the parties' son did attend individual counseling, but he never "received ongoing individual therapy" without Mrs. Fatokun present in the sessions due to Mrs. Fatokun's "need and insistence to be present."

Although Mrs. Fatokun testified she only attended two of the sessions with the parties' son, the guardian ad litem refuted this testimony by indicating Mrs. Fatokun attended all but one counseling session. During the sessions attended by Mrs. Fatokun, the guardian ad litem testified the counselor disclosed the parties' son alleged one incident of corporal punishment by his father, and the child used the words "verbal, emotional, and physical abuse." The counselor shared with the guardian ad litem that Mrs. Fatokun "was always around." Further, at the one session Mrs. Fatokun did not attend, the minor child talked about school and then advised the counselor that this would be his last counseling session. The guardian ad litem testified it is her opinion that the parties' son is "very confused" about his relationship with Mr. Fatokun.

{¶12} Further, the guardian ad litem testified she watched videos of unsupervised parenting time between Mr. Fatokun and both children. In the unsupervised videos with the parties' minor son, the child "seemed happy." The guardian ad litem explained, "[h]e was running around. He was playing. They were doing [] games and it just seemed very natural." The guardian ad litem described Mr. Fatokun's unsupervised parenting time with the parties' minor daughter as "[v]ery natural." Specifically, the guardian ad litem stated:

> when they were walking to the library, she was on father's shoulders. She was patting his head. They were very loving to one another. She was guiding him around with her hand in the library. They were playing kitchen. And she was, kept going to him like she needed reassurance. It seemed, again, very loving and very natural.

{¶13} The trial court also considered Mrs. Fatokun's "conduct, continued statements of alleged abuse, and [Mrs. Fatokun] successfully keeping the children from visiting and interacting with [Mr. Fatokun] [as] the primary reasons for such [a] strained relationship." As to the charges filed against Mr. Fatokun in Elyria Municipal Court due to an alleged incident with Mrs. Fatokun, although Mrs. Fatokun said the charges were dropped because the prosecutor did not charge Mr.

Fatokun properly, the guardian ad litem indicated the charges were dropped by the prosecutor but it "wasn't very clear" as to why the prosecutor dropped the charges. The guardian ad litem explained that after the State did not move forward with the charges, visitation started becoming unsupervised to move forward with this case.

{¶14} "[B]ased on the *credible* evidence presented and the applicable law and factors per R.C. 3109.04(F)(1)(a-j) and R.C. 3109.04(F)(2)(a-c)," the trial court determined shared parenting was not in the best interests of the minor children at this time and named Mr. Fatokun the residential and custodial parent of the minor children. (Emphasis added.)

{¶15} Although the dissent rightly acknowledged that the trial court was in the best position to make credibility determinations and the trial court was not bound by the recommendation of the guardian ad litem, it goes on to clearly substitute its own concerns and judgment for that of the trial court. When applying an abuse of discretion standard, as we do here, a reviewing court is precluded from substituting its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). The dissent isolates portions of the record to make legal arguments on behalf of Mrs. Fatokun, which is not in the realm of authority for a reviewing court. Notably, the dissent relies upon specific quotes taken from a *confidential* in camera interview by the trial court with the parties' minor son. The majority is troubled that the dissent has unnecessarily and wrongly compromised the minor child's confidentiality disclosing the minor child's private thoughts made in chambers to the trial court. R.C. 3109.04(B)(2)(c) states: "[t]he [in camera] interview shall be conducted in chambers, and no person other than the child, the child's attorney, the judge, any necessary court personnel, and, in the judge's discretion, the attorney of each parent shall be permitted to be present in the chambers during the interview." Indeed, this Court has stated:

> We believe that judges should be allowed to keep their private conversations with the children of divorced parents confidential, as many times it is only this promise of confidentiality that convinces these embattled children to speak freely.

*In Matter of Longwell*, 1995 WL 520058, * 4 (9th Dist. Aug. 30, 1995).

{¶16} Further, regarding the dissent's stated concerns that the trial court acted unreasonably in awarding sole custody to Mr. Fatokun when he: "(1) has never been the primary caregiver of the children; (2) has not demonstrated his ability to care for the children on a full-time basis; (3) has not demonstrated that he will facilitate visitation with Mrs. Fatokun; and (4) is alleged to have abused Mrs. Fatokun and the children[,]" the record does not support this conclusion. As the guardian ad litem stated in her testimony, Mr. Fatokun's parenting time with the minor children was disjointed and limited which did not provide Mr. Fatokun the opportunity to be a full-time father. However, based upon testimony and evidence, Mr. Fatokun never withheld the children from Mrs. Fatokun and demonstrated his willingness to follow the orders of the trial court and the recommendations of the guardian ad litem. Further, the guardian ad litem viewed Mr. Fatokun's unsupervised visitation with the minor children, although limited, as very natural and loving and characterized the parties' minor son as "happy" during this time-period.

{¶17} Mrs. Fatokun has not met her burden to show that the trial court's decision "'is contrary to law, unreasonable, not supported by evidence, or grossly unsound.'" *Menke*, 2015-Ohio-2507, at ¶ 8, quoting *Tretola*, 2015-Ohio-1999, at ¶ 25.

{¶18} Accordingly, Mrs. Fatokun's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND ABUSED ITS DISCRETION WHEN IT ORDERED THAT [MRS. FATOKUN] WAS TO COMPENSATE [MR. FATOKUN] FOR THE FEDERAL TAX REFUND RECEIVED.**

**ASSIGNMENT OF ERROR III**

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ORDERED [MRS. FATOKUN] TO REIMBURSE [MR. FATOKUN $4,480.00] FROM MONIES WITHDRAWN FROM THE PARTIES' JOINT ACCOUNT.**

{¶19} In her second and third assignments of error, Mrs. Fatokun argues the trial court erred when it ordered Mrs. Fatokun to compensate Mr. Fatokun in the amount of: (1) $6,145.00 for monies received from her individual 2021 federal income tax return; and (2) $4,480.00 for monies Mrs. Fatokun removed from the parties' joint checking account. "A trial court is vested with broad discretion when fashioning a division of marital property." *Naylor v. Naylor*, 2004-Ohio-4452, ¶ 16 (9th Dist.). As indicated above, an abuse of discretion is present when a trial court's decision "'is contrary to law, unreasonable, not supported by evidence, or grossly unsound.'" *Menke*, 2015-Ohio-2507, at ¶ 8, quoting *Tretola*, 2015-Ohio-1999, at ¶ 25.

{¶20} R.C. 3105.171(F) states:

In making a division of marital property and in determining whether to make and the amount of any distributive award under this section, the court shall consider all of the following factors:

(1) The duration of the marriage;

(2) The assets and liabilities of the spouses;

(3) The desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage;

(4) The liquidity of the property to be distributed;

(5) The economic desirability of retaining intact an asset or an interest in an asset;

(6) The tax consequences of the property division upon the respective awards to be made to each spouse;

(7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;

(8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;

(9) Any retirement benefits of the spouses, excluding the social security benefits of a spouse except as may be relevant for purposes of dividing a public pension;

(10) Any other factor that the court expressly finds to be relevant and equitable.

{¶21} Here, the de facto termination date of the parties' marriage, as stipulated by the parties, is May 25, 2021. As it pertains to the parties' 2021 taxes, the parties were still married for a portion of the 2021 tax year, even taking the de facto termination date into consideration. The record indicates, for the 2021 tax-year, Mr. Fatokun paid the IRS $3,600.00, while Mrs. Fatokun received a tax refund in the amount of $8,690.00. Based upon this record, this Court cannot say the trial court abused its discretion in equitably dividing the tax refund and debt between the parties.

{¶22} Further, as to the monies Mrs. Fatokun removed from the parties' joint checking account on April 19, 2021, and May 3, 2021, there was testimony at trial Mrs. Fatokun removed the money, at Mr. Fatokun's instruction, in order to file a divorce action. However, Mr. Fatokun denied giving Mrs. Fatokun this instruction because he claimed he did not want a divorce. The amount of money Mrs. Fatokun removed from the parties' joint checking account totaled $8,960.00. Based upon this record, we cannot say the trial court abused its discretion in ordering Mrs. Fatokun to compensate Mr. Fatokun for one-half of the amount removed.

{¶23} Accordingly, Mrs. Fatokun's second and third assignments of error are overruled.

### ASSIGNMENT OF ERROR IV

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO RULE ON [MRS. FATOKUN'S] MOTION TO REIMBURSE FUNDS FILED ON JUNE 1, 2024[,] PRIOR TO THE FINAL DAY OF TRIAL AND PRIOR TO THE ISSUANCE OF THE FINAL DECREE OF DIVORCE.**

**{¶24}** In her fourth assignment of error, Mrs. Fatokun argues the trial court erred in failing to rule on her motion to reimburse funds. Although Mrs. Fatokun's assignment of error indicates this motion was filed on June 1, 2024, a review of the record reveals it was filed on June 1, 2023. The motion seeks reimbursement in the amount of $14,598.24 for alleged car repairs, medical bills, living expenses, and hotel stays "due to the fact [Mrs. Fatokun] is required to stay in Ohio with the children." Notably, Mrs. Fatokun fails to point to any order of the trial court requiring Mr. Fatokun to pay any of these alleged expenses. In fact, the record indicates Mr. Fatokun made timely court ordered support payments to Mrs. Fatokun during the pendency of this action.

**{¶25}** Indeed, "[w]hen a trial court fails to rule on a pretrial motion, it is presumed that the court overruled it." *State ex rel. Scott v. Streetsboro*, 2016-Ohio-3308, ¶ 14.

**{¶26}** Accordingly, Mrs. Fatokun's fourth assignment of error is overruled.

## III.

**{¶27}** Mrs. Fatokun's assignments of error are overruled. The judgment of the Lorian County Court of Common Pleas, Division of Domestic Relations, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period

for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
BETTY SUTTON
FOR THE COURT

HENSAL, J.
CONCURS.

FLAGG LANZINGER, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶28} While I concur with the majority's resolution of Mrs. Fatokun's second, third, and fourth assignments of error, I disagree with its resolution of her first assignment of error. The majority holds that the trial court did not abuse its discretion when it awarded Mr. Fatokun sole custody of the minor children (separately, "Son" and "Daughter") and awarded Mrs. Fatokun parenting time, per option 1 or option 2, with the minor children. I disagree.

{¶29} At trial, Mrs. Fatokun testified that Mr. Fatokun threatened to kill her, emotionally and physically abused her, and physically abused Son. Mrs. Fatokun also testified that Daughter returned home from visits with Mr. Fatokun upset and hungry, and that Daughter told her Mr. Fatokun "beat" her. According to Mrs. Fatokun, the domestic violence case that precipitated the protection order was ultimately dismissed because the prosecutor charged Mr. Fatokun incorrectly.

{¶30} Mr. Fatokun testified that he never abused Mrs. Fatokun or his children. Mr. Fatokun acknowledged his strained relationship with Mrs. Fatokun but testified that she is a "good woman" who is "very loving, caring, smart, [and] curious . . . ." Mr. Fatokun testified that he

preferred "shared custody, 50/50," and that it was in the best interests of their children to spend time with both parents. Alternatively, Mr. Fatokun testified that he wanted full custody of the children if Mrs. Fatokun lived out of state, and that he would facilitate visitation. Mr. Fatokun also testified that he was willing to participate in counseling with Son.

{¶31} The GAL testified that she spoke with Son's counselor about the alleged abuse. According to the GAL, Son's counselor believed Son was "suffering from traumas based on some abuse that he had suffered at the hands of father." The GAL noted that "[i]t does sound as though there is a fear of father" and opined that she did not "think that being in a household right away, 50% of the time with someone who may have inflicted harm is a good idea."

{¶32} The GAL recommended that Mrs. Fatokun have custody of the children and that Mr. Fatokun have scheduled visitation time. Specifically, the GAL recommended a "phase in" parenting schedule for Mr. Fatokun and Daughter. Under this "phase in" schedule, Mr. Fatokun's parenting time with Daughter would start with a few hours two days per week and would increase over time. For Son, the GAL recommended that Son attend counseling sessions and that he have visitation with Mr. Fatokun for a few hours one day per week. The GAL recommended that any other visitation with Son and Mr. Fatokun be discussed with Son's counselor.

{¶33} The GAL testified that she did not recommend a shared parenting plan because there had been no opportunity to assess whether a shared parenting plan would work. This was due, in part, to the protection order that was in place for one year, resulting in Mr. Fatokun having no contact with Mrs. Fatokun or their children. The GAL acknowledged that Mrs. Fatokun had a history of not facilitating parenting time after the protection order terminated, but also acknowledged that it was unclear whether Mr. Fatokun would facilitate parenting time because he had not been given an opportunity to demonstrate that he would.

{¶34} After trial, the trial court conducted an in camera interview with Son, who was 11 years old at the time. Son explained that his relationship with Mrs. Fatokun is a "10" out of 10 and that he enjoys living with her. Son explained that Mr. Fatokun physically abused him, including hitting him with a hanger, pulling his ears, and stripping him naked and hitting him on his "bum bum . . . ." I would note that, as a mandatory reporter, the trial court had a duty to report known or suspected child abuse. R.C. 2151.421.

{¶35} Son also explained that he wants "no communication" and "nothing to do" with Mr. Fatokun. Son explained that he refused to attend some of the scheduled visitation with Mr. Fatokun even though Mrs. Fatokun told him it was court-ordered visitation. Son explained that Mrs. Fatokun did not prevent him from attending visitation with Mr. Fatokun and that he chose not to go because he "d[oesn't] like going with him." In short, Son unequivocally expressed to the trial court that he wished to live with Mrs. Fatokun and wanted no contact with Mr. Fatokun,

{¶36} More than seven months later, the trial court issued its judgment entry. In it, the trial court determined that Mrs. Fatokun was not credible and that she made "false allegations" against Mr. Fatokun to "obstruct" him from being a father to his children. The trial court found that Son's strained relationship with Mr. Fatokun was solely due to Mrs. Fatokun's influence over him. The trial court also found that Son "began to take sides with his mother and mimic everything mother said." To that end, the trial court noted that Mrs. Fatokun was present during almost all of Son's counseling sessions and that Son used certain terminology to describe the alleged abuse that is not generally used by children his age. While the trial court did not address the in camera interview it had with Son, it is clear the trial court determined that Son's allegations of abuse were not credible because they were made under the purported encouragement and influence of Mrs. Fatokun.

**{¶37}** The trial court ultimately determined that Mr. Fatokun was bonded with his children despite having a "strained and complicated" relationship with Son. As noted, the trial court awarded Mr. Fatokun sole custody of the children and awarded Mrs. Fatokun parenting time, per option 1 or option 2. For the following reasons, I would hold that the trial court erred by doing so.

**{¶38}** Initially, I acknowledge that the trial court was in the best position to make credibility determinations. *Okoye v. Okoye*, 2018-Ohio-74, ¶ 65 (9th Dist.). I also acknowledge that the trial court was not bound by the recommendation of the GAL. *Rice v. Sobel*, 2015-Ohio-2251, ¶ 35 (9th Dist.). Instead, it was the trial court's duty to allocate parental rights and responsibilities in the best interests of the children. *In re A.A.*, 2019-Ohio-902, ¶ 15 (9th Dist.); R.C. 3109.04(B)(1). I would hold that it failed to do so.

**{¶39}** A significant portion of the trial court's best-interest analysis was focused upon Mrs. Fatokun's failure to facilitate visitation and counseling. The record reflects that Son did not consistently attend visitation with Mr. Fatokun after the protection order terminated. According to Son, this was because he did want to attend visitation with Mr. Fatokun, not because Mrs. Fatokun discouraged him from doing so. The record also reflects that Mrs. Fatokun did not cooperate with facilitating counseling between Son and Mr. Fatokun, and that she disregarded certain court orders. *See* R.C. 3109.04(F)(1)(f). Notwithstanding, the record also reflects that Mrs. Fatokun is a loving and caring mother. In fact, Mr. Fatokun described her as a "good woman" who is "very loving, caring, smart, [and] curious . . . ." The GAL similarly described Mrs. Fatokun as a loving and caring mother. There was no dispute that Mrs. Fatokun was bonded with both children.

**{¶40}** Additionally, the record reflects that Mr. Fatokun worked throughout the parties' marriage and that Mrs. Fatokun was primarily responsible for taking care of the children.

According to Mrs. Fatokun, she worked outside of the home at times, but Mr. Fatokun discouraged her from doing so because he wanted her to stay home and care for their children. Mr. Fatokun disputed this, but there appears to be no dispute that Mrs. Fatokun was the primary caregiver for the children during the parties' marriage.

**{¶41}** The trial court's judgment places the children in the sole custody of a parent who: (1) has never been the primary caregiver of the children; (2) has not demonstrated his ability to care for the children on a full-time basis; (3) has not demonstrated that he will facilitate visitation with Mrs. Fatokun; and (4) is alleged to have abused Mrs. Fatokun and the children. In short, the trial court's judgment takes the children away from their "very loving, caring" primary caregiver and places them with a parent who has spent a limited amount of time with them over the past few years. Abuse allegations aside, I would conclude that this was unreasonable and not in the best interests of the children. *See Kokoski v. Kokoski*, 2013-Ohio-3567, ¶ 26 (9th Dist.); *Menke v. Menke*, 2015-Ohio-2507, ¶ 8 (9th Dist.).

**{¶42}** Turning to the abuse allegations, I am concerned with the trial court's wholesale rejection of the allegations based upon its conclusion that Mrs. Fatokun was not credible and that Son was simply mimicking everything Mrs. Fatokun said. Minimally, Son's relationship with Mr. Fatokun is "strained and complicated . . . ." The GAL opined, and I agree, that "being in a household right away, 50% of the time with someone who may have inflicted harm is [not] a good idea." This is especially so given that the record indicates that Son feared Mr. Fatokun and refused to attend visitation on multiple occasions. Regardless of the source of the strained relationship, I fail to see how it is in Son's best interest to award Mr. Fatokun sole custody.

**{¶43}** Having reviewed the record, it is clear that the trial court was frustrated by Mrs. Fatokun's conduct during trial, as well as her failure to adhere to its orders. While I do not condone

Mrs. Fatokun's failure to adhere to the trial court's orders, the determination of the best interests of the children is a separate issue. There was no dispute that Mrs. Fatokun is a loving and caring mother who is bonded with her children and has been their primary caregiver throughout their lives. Facilitating visitation is one factor to consider when determining the best interests of the children. R.C. 3109.04(F)(1)(f). But so are "the wishes and concerns of the child, as expressed to the court[.]" R.C. 3109.04(F)(1)(b). Son unequivocally expressed to the trial court during the in camera interview that he wants to live with Mrs. Fatokun, that he wants nothing to do with Mr. Fatokun, and that Mr. Fatokun abused him. Under prior versions of R.C. 3109.04, had Son been 12 years old, Son's wishes would have likely governed. *See Schottenstein v. Schottenstein*, 2001 WL 1511949, *13 (10th Dist. Nov. 29, 2001), citing former versions of R.C. 3109.04; *Kager v. Kager*, 2002-Ohio-3090, ¶ 15 (5th Dist.) ("Under the earlier versions of R.C. 3109.04, a court was generally permitted to allow a child who was twelve years of age or older to choose their residential parent."). Here, the trial court unreasonably discounted Son's wishes. Meanwhile, without expressly addressing each best-interest factor, the trial court construed the underlying facts and testimony—including the allegations of abuse—in Mr. Fatokun's favor to support its best-interest determination. At best, this was unreasonable. At worst, this potentially exposes the children to harm.

**{¶44}** Aside from Mr. Fatokun's self-serving testimony and favorable testimony from witnesses he called on his own behalf, there is no evidence indicating that it is in the children's best interests for Mr. Fatokun to have sole custody. In holding otherwise, the trial court completely disregarded Mrs. Fatokun and Son's abuse allegations and appears to have used a custody award to punish Mrs. Fatokun for violating its orders, speaking out about the alleged abuse, and not forcing Son to attend court-ordered visitation that Son did not want to attend. I would hold that

the trial court abused its discretion because its decision was not supported by the evidence and was unreasonable. *See Kokoski*, 2013-Ohio-3567, at ¶ 26 (9th Dist.); *Menke*, 2015-Ohio-2507, at ¶ 8 (9th Dist.). Accordingly, I would sustain Mrs. Fatokun's first assignment of error. I otherwise concur with the majority opinion.

APPEARANCES:

DAVID J. BERTA, Attorney at Law, for Appellant.

SUSAN J. LAX, Attorney at Law, for Appellee.